AO 106 (Rev. 04/10) Application for a Search Warrant





# UNITED STATES DISTRICT COURT
### for the
### Southern District of Texas

FILED

APR 10 2018

David J. Bradley, Clerk of Court

| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. **H18-0561M** |
| LASHONYAJOHNSON@HOTMAIL.COM | ) | |
| Microsoft Corporation | ) | |
| 1 Microsoft Way | ) | |
| Redmond, WA 98052 | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

LASHONYAJOHNSON@HOTMAIL.COM, Microsoft Corporation, 1 Microsoft Way, Redmond, WA 98052

located in the _____ Southern _____ District of _____ Texas _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachments A and B to the Affidavit in Support of Search Warrant.

UNSEALED
PER ORDER

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1347, 1349 | Health Care Fraud, Conspiracy to Commit Health Care Fraud |
| 18 U.S.C. § 1956, 1957 | Money Laundering |
| 42 U.S.C. § 1320a-7b(b) | Receipt or Payment of Kickbacks |

The application is based on these facts:

See attached Affidavit of Adam Watson, Special Agent with the United States Postal Service, Office of Inspector General

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Adam Watson, Special Agent of USPS-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 10, 2018
12:30 pm

_____
*Judge's signature*

City and state: Houston, Texas

United States Magistrate Judge Frances H. Stacy
*Printed name and title*

Sealed
Public and unofficial staff access to this instrument are prohibited by court order.



Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

H18-0561M

| | | |
|---|---|---|
| In the Matter of the Application by the | § | **UNDER SEAL** |
| United States of America for a Search | § | |
| Warrant of: | § | Case No. |
| LASHONYAJOHNSON@HOTMAIL.COM | § | |
| that is Stored at Premises Controlled by | § | |
| Microsoft. | § | |

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, Adam Watson, being first duly sworn, hereby depose and state as follows:

**I.**   <u>**Introduction and Background of the Affiant**</u>

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises controlled by Microsoft Corporation ("Microsoft"), an email provider headquartered at 1 Microsoft Way Redmond, WA 98052. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Microsoft to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.     My name is Adam Watson ("Affiant"), and I am employed as a Special Agent with the United States Postal Service, Office of Inspector General ("USPS-OIG"). I have been a Special Agent with the USPS-OIG since May 2005. As a Special Agent with USPS-OIG, I am charged

with investigating violations of the laws of the United States, collecting evidence in cases in which the United States is or may be a party in interest, and investigating crimes involving funding from the United States Postal Service.

3. During my tenure as a Special Agent, I have been trained in the execution of search warrants for documents and other evidence in cases involving violations of federal law, including but not limited to: Title 18, United States Code, Sections 1347 (Health Care Fraud), 1349 (Conspiracy to Commit Health Care Fraud), 1956 (Money Laundering), 1957 (Money Laundering), and Title 42, United States Code, Section 1320a-7b(b) (Receipt or Payment of Kickbacks). I am currently assigned to the Houston Office, Southern Area Field Office of the USPS-OIG and am being assisted in the investigation by the Department of Labor, Office of Inspector General ("DOL-OIG"), Department of Veterans Affairs Office of Inspector General ("VA-OIG"), and Defense Criminal Investigative Service ("DCIS").

4. During the course of my employment, I have participated in numerous searches, including searches of electronic media, such as emails and computer files. In my healthcare fraud investigations, I commonly utilize internet resources, including reviews of social media, public records, and so forth. I am familiar with email, cloud storage, text messages, and other forms of electronic information sharing and storage.

## II. **Purpose of the Affidavit**

5. I make this Affidavit in support of an application for a search warrant for information associated with the email account LASHONYAJOHNSON@HOTMAIL.COM ("SUBJECT ACCOUNT") that is stored at premises controlled by Microsoft, an email provider headquartered at 1 Microsoft Way Redmond, WA 98052.

6. There is probable cause to believe that evidence of the violation of federal laws,

2

including Title 18, United States Code, Sections 371, 1347, and 1349 and Title 42, United States Code, Section 1320a-7b(b) (collectively, the "SUBJECT OFFENSES"), are located in the SUBJECT ACCOUNT.

### III.  Jurisdiction

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is a "district court of the United States . . . [that] has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### IV.  Background Information on Compounded Drugs

8.     The investigation focuses on allegations of a conspiracy involving the below-referenced individuals, through the below-referenced entities, to defraud government programs through billings for compounded pharmaceuticals or medicines ("Compounded Drugs") for patients where those Compounded Drugs are not medically necessary or not prescribed legitimately.

9.     By way of background, in the healthcare industry, the practice of producing Compounded Drugs is generally defined as the practice in which a licensed pharmacist, a licensed physician, or an outsourcing facility under the supervision of a licensed practitioner combines, mixes, or alters ingredients in response to a doctor's written prescription to create a medication tailored to the medical needs of a specific patient.

10.     Compounded Drugs may be prescribed by a physician when an FDA-approved drug does not meet the medical needs of a particular patient. A patient may, for example, have a specific condition that would be generally treated by an FDA-approved drug but such a drug may not be appropriate for the patient because he or she may be allergic to a specific ingredient, such as a dye

3

or preservative, in that drug. In that scenario, the patient may receive a prescription from a physician for a specific Compounded Drug that excludes whatever ingredient or aspect that prevents that patient from otherwise using the FDA-approved drug. A patient also may, for example, be unable to take an FDA-approved drug for a medical condition because he or she cannot consume the drug by traditional means, such as swallowing. In that scenario, the patient may again receive a prescription from a physician for a Compounded Drug that allows the patient to take medicine in another form, perhaps liquid or powder, so that he or she may consume it.

11.     Compounded Drugs are not approved by the United States Food and Drug Administration ("FDA"). In other words, the FDA does not verify the safety, potency, effectiveness, or manufacturing quality of Compounded Drugs.

12.     The Texas State Board of Pharmacy regulates the practice of compounding in the State of Texas.

V.     **THE DEFRAUDED HEALTHCARE BENEFIT PROGRAMS**

A.     **The Federal Employee's Compensation Act**

13.     Title 18, United States Code, Section 24(b) defines a health care benefit program as any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual and included any individual or entity who provided a medical benefit, item, or service for which payment may be made under the plan or contract.

14.     The Federal Employee's Compensation Act ("FECA") is a health care benefit program as defined in Title 18, U.S.C. Section 24(b).

15.     FECA is a "Federal health care program" as defined by 42 U.S.C. § 1320 a-7b, that affects commerce, and as the term is used in 18 U.S.C. § 1320 a-7b(b).

16.     FECA provides for payment of workers' compensation benefits to federal

employees who suffer an injury, disease, or death in the performance of duty. To establish a claim for benefits, a medical condition is required to be causally related to a claimed injury, disease, or death. Benefits are only available while a work-related condition continued. The benefits under FECA include continuation of pay ("COP") for up to 45 calendar days, compensation for lost wages, all necessary medical care, medical supplies and prescription drugs, vocation rehabilitation services, and disability payments. FECA provides coverage for pharmaceuticals necessary to treat symptoms which are the result of a work-related injury if prescribed by a doctor and medically necessary.

17.     The Department of Labor ("DOL") Office of Workers' Compensation Program ("OWCP") administers the benefits under FECA. Providers of health care services are required to enroll with DOL-OWCP to receive a provider identification number and reimbursement under FECA. Form OWCP-1168 is used for enrollment and updating provider information. By completing and submitting Form OWCP-1168, a provider certifies that all the federal and state licensure and regulatory requirements applicable to their provider type are satisfied.

18.     DOL-OWCP contracts with Affiliated Computer Services ("ACS") to provide medical claims processing and payments. ACS serves as the billing administrator for FECA. In this capacity, ACS receives provider enrollment forms from prospective FECA providers, assigns provider numbers, and processes and pays claims for benefits under FECA.

19.     All providers are required to enroll with DOL-OWCP through ACS. After the assignment of a provider number, the provider is given access to the ACS online system by which the provider may submit bills, check the status of pending claims, and perform other billing related functions. The provider may submit bills using either the ACS provider number or the provider's Social Security number.

20.     Providers are required to identify on each claim the services provided. All claims submitted are required to be supported by medical evidence. The submission of a claim and acceptance of payment by a provider signifies that the service for which reimbursement was sought, was performed as described, medically necessary and appropriate, and properly billed in accordance with accepted industry standards. It is not within industry standards, among other things, to charge for services that are not medically necessary, not legitimately prescribed, or both.

21.     Payments are sent to providers via electronic funds transfer ("EFT"). Remittance notices listing all the claims paid on each EFT are sent to providers. Payments are tracked by DOL-OWCP through a Transaction Control Number ("TCN").

## B. The TRICARE Program

22.     TRICARE is a triple-option entitlement plan established by Congress and funded through federal appropriations and allocated as part of the National Defense Authorizations Act. Eligible beneficiaries include all seven branches of the Uniformed Services: Army, Air Force, Navy, Marine Corps, National Oceanic Atmospheric Administration, Coast Guard, and the commissioned corps of the Public Health Service. TRICARE benefits are authorized by congressional legislation incorporated in Chapter 55 of Title 10, United States Code, and administered by the Secretary of Defense in Title 32, Code of Federal Regulations, Part 199 (32 C.F.R. 199). Individuals who receive health care benefits through TRICARE are referred to as TRICARE beneficiaries. The Defense Health Agency ("DHA"), an agency of the Department of Defense, is the military entity responsible for overseeing and administering the TRICARE program.

23.     TRICARE is a "health care benefit program," as defined by 18 U.S.C. § 24(b), that affects commerce and as the term is used in 18 U.S.C. §§ 1349, 1347.

24.    TRICARE is a "Federal health care program," as defined by 42 U.S.C. § 1320 a-7b, that affects commerce and as the term is used in 18 U.S.C. § 1320 a-7b(b).

25.    TRICARE provides coverage for certain prescription drugs, including certain Compounded Drugs, which are medically necessary and legitimately prescribed by a licensed physician. TRICARE beneficiaries may fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies. If a beneficiary choses a network pharmacy, the pharmacy may collect any applicable co-pay from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to TRICARE through the contracted pharmacy benefit manager.

26. Express Scripts Inc. ("ESI") is TRICARE's pharmacy benefit manager contractor for the retail pharmacy and mail-order prescription services. ESI is responsible for providing a retail pharmacy network, mail order pharmacy services, claims adjudication, and pharmacy benefit management services for the more than nine million beneficiaries who belong to the TRICARE Pharmacy Program. To become a network pharmacy and eligible to submit claims to the Government, through ESI, a pharmacy agrees to be bound by, and comply with, all applicable State and Federal laws, specifically those addressing fraud, waste, abuse, and compliance with state boards of pharmacy.

**VI.    The Relevant Entities and Individuals**

26.    ACP of The Woodlands ("ACP") is a pharmacy involved in the compounding of Compounded Drugs located at 26202 Oak Ridge Drive Suite 102-A, Spring, Texas 77380. ACP is enrolled with DOL-OWCP and TRICARE through ESI. On November 7, 2017, agents executed a search warrant authorized by this Court at ACP's above-referenced location.

27.    From in or around November 2015 to in or around January 2018, ACP billed DOL-

7

OWCP approximately $75,641,289.00 for Compounded Drugs and other medicines. DOL-OWCP paid approximately $21,689,629.00 on those claims.

28.     From in or around November 2015 to in or around March 2017, ACP billed TRICARE approximately $10,400.00 and was electronically paid approximately $1,543.00 for Compounded Drugs and other medicines.

29.     Compounding Solutions, doing business as Healthquest Pharmacy, was a pharmacy involved in the compounding of Compounded Drugs located at 11240 FM 1960 West, Suite 404, Houston, Texas 77065. Compounding Solutions was enrolled with DOL-OWCP and TRICARE through ESI. On June 8, 2017, agents executed a search warrant authorized by this Court at Compounding Solutions above-referenced location.

30.     From on or about September 1, 2014 to on or about June 15, 2017, Compounding Solutions billed DOL-OWCP approximately $50,389,736.00 for Compounded Drugs and other medicines. DOL-OWCP paid approximately $19,094.132.00 on those claims.

31.     From on or about January 1, 2015 and on or about October 1, 2016, Compounding Solutions billed TRICARE $2,125,459.00 for Compounded Drugs. TRICARE paid approximately $1,714,000.00 on those claims.

32.     Injured Federal Workers Advocate Association LLC ("IFWAA") currently is a limited liability company doing business at 5821 Southwest Freeway, Suite 550, Houston, Texas 77057. IFWAA was a non-profit corporation formed in the State of Texas on or about November 21, 2014. A certification of termination for the non-profit status was filed with the Texas Secretary of State on or about October 31, 2015. On June 8, 2017, agents executed a search warrant authorized by this Court at IFWAA's above-referenced location.

30.     Top Doctor Management, LTD ("Top Doctor"),[1] according to records of the Texas Secretary of State, was a Texas limited partnership, located at 7007 North Freeway, Suite 200, Houston, Texas 77076. Top Doctor was enrolled in the DOL-OWCP Program.[2] Investigation indicates that Top Doctor was a medical clinic. On June 8, 2017, agents executed a search warrant authorized by this Court at Top Doctor's above-referenced location.

33.     Eudora Healthcare Consulting LLC ("Eudora") is a Texas-incorporated limited liability corporation, located at 4141 Southwest Freeway, Suite 390, Houston, Texas 77027. On June 8, 2017, agents executed a search warrant authorized by this Court at Eudora Healthcare's above-referenced location.

34.     Eudora is recorded as the "Depositor Account Title" on the Department of Treasury Standard Form (SF) 3881[3], a form submitted on behalf of Compounding Solutions to DOL-OWCP for Compounding Solutions to be reimbursed for its approved claims to DOL-OWCP. Compounding Solutions electronically submits claims through the ACS online system using its

---

[1]     Top Doctor since in or around 2014 has changed its legal name with the Texas Secretary of State. These changes to the legal name consistently involve iterations of "Top Doctor."

[2]     Top Doctor's SF-3881 directs DOL-OWCP reimbursements to be paid to an account in the name of Top Doctor Therapy Center.

[3]     A Federal agency initiates a SF-3881 form to enroll its vendors to receive payment by electronic funds transfer. In the Financial Institution Information Section of the SF-3881, the financial institution prints or types the name and address of the payee/company's financial institution who will receive the Automated Clearing House (ACH) payment, ACH coordinator name and telephone number, nine-digit routing transit number, depositor (payee/company) account title, and account number. Also, the box for type of account is checked, and the signature, title, and telephone number of the appropriate financial institution official are included.

assigned provider number.

35.     DOL-OWCP electronically deposits payments for Compounding Solutions' approved claims for Compounded Drugs and other medicines into Eudora's bank account. According to bank records returned in this investigation, from on or about October 16, 2014 to on or about November 25, 2016, DOL-OWCP electronically paid approximately $17,133,799.66 to the bank account of Eudora for Compounding Solutions' approved claims for Compounded Drugs and other medicines.

36.     Lashonya (a/k/a Lashonia) Johnson ("JOHNSON"), according to records of the Secretary of State, is Manager of ACP and is both a Director and Governing Person of IFWAA. According to bank records returned in this investigation and Top Doctor SF-3881, JOHNSON is the CEO of Top Doctor and is listed as an authorized signatory for Top Doctor.

37.     John Cruise ("CRUISE"), according to records of the Texas Secretary of State, is President of ACP and both a Director and Governing Person of IFWAA. CRUISE, according to records of the Texas Secretary of State, was a Registered Agent at Top Doctor.

38.     According to the records from Harris County, Texas, CRUISE and JOHNSON are married.

39.     Turnbull Media LLC ("Turnbull Media"), according to records of the Texas Secretary of State, is a Texas limited liability company, located at 5380 West 34th Street, #230, Houston, Texas 77092. This address is a personal mailbox located within in a UPS Store at that address. Investigation revealed CRUISE is the regular box holder for personal mailbox #230. According to UPS Store records, CRUISE leased the mailbox from August 29, 2011 through July 22, 2015. "Small Business Today Magazine" was the business associated with this mailbox during CRUISE's rental period. Bank records returned during the investigation indicated Small Business

Today Magazine is associated with a Turnbull Media account where CRUISE is an authorized signatory. After July 22, 2015 personal mailbox #230 was leased to an individual with no connection to this investigation.

40.     CRUISE, according to records of the Texas Secretary of State, is the Manager of Turnbull Media.

41.     Affiant believes, based on his experience investigating criminal offenses that Turnbull Media is a shell company through which CRUISE, and his co-conspirators, funnel ill-gotten gains, including potential kickbacks, from fraudulent billings by Compounding Solutions to DOL-OWCP for Compounded Drugs.

42.     From on or about December 1, 2014 to on or about December 2, 2016, $4,165,711.98 was transferred from the bank account of Eudora to that of Turnbull Media.

43.     Kenny Ozoude ("OZOUDE"), according to bank records returned in this investigation, is an authorized signatory for a bank account of Compounding Solutions, doing business as Healthquest Pharmacy. OZOUDE, according to bank records returned in this investigation, is listed as an authorized signatory for Top Doctor. OZOUDE, according to records of the Texas Secretary of State and bank records returned in this investigation, also is listed both as the President of Eudora and as the authorized signatory for Eudora's bank accounts.

44.     Dr. James Don Jackson, Jr. ("DR. JACKSON"), according to records of the Texas Medical Board, is a physician licensed in the State of Texas. DR. JACKSON, according to those same records, had a primary specialty of surgery and practiced at 4002 South Loop 256, Suite F, Palestine, Texas 75801. Investigation in this case revealed that DR. JACKSON also purportedly treated patients at Top Doctor at its above-referenced location. DR. JACKSON is enrolled in the DOL-OWCP program.

11

45.     Between on or about April 14, 2016 to on or about March 9, 2017, billing records of the U.S. Postal Service indicates that Compounding Solutions was reimbursed by DOL-OWCP approximately $770,843.00 for Compounded Drugs and other medications prescribed to approximately 18 Postal Service claimants residing in the Houston area, whom were also treated by DR. JACKSON.

46.     Between on or about March 28, 2016 to on or about June 5, 2017, DR. JACKSON received from Eudora approximately $121,100. Affiant believes based on his investigation that those payments are likely kickbacks for the prescriptions of Compounded Drugs and other medicines that DR. JACKSON sent to Compounding Solutions.

47.     Dr. Jay Bender ("DR. BENDER"), according to records of the Georgia Medical Board, is a physician licensed in the State of Georgia. DR. BENDER, according to those same records, has a primary specialty of Physical Medicine and Rehabilitation and practices at 2500 Hospital Road Boulevard Suite 150, Roswell, Georgia 30076. Investigation revealed that DR. BENDER previously practiced at Bender Orthopaedics and Spine Specialist which was located at 1800 Peachtree Street Northwest Suite 450, Atlanta, Georgia 30309.

48.     DR. BENDER is enrolled in the DOL-OWCP program and, according to the DOL-OWCP Provider Enrollment form, lists 1800 Peachtree Street NW Suite 450 Atlanta, Georgia 30309 as a physical address for Bender Orthopaedics and Spine Specialist. During the course of the investigation, it was determined that employees of IFWAA worked within Bender Orthopaedics and Spine Specialist located at the 1800 Peachtree Street NW Suite 450. These employees advised agents during interviews that they reported to JOHNSON, CRUISE, and other managers of IFWAA.

49.     Between on or about November 5, 2015 and on or about September 7, 2017, DOL-OWCP claims data indicates that ACP was reimbursed by DOL-OWCP approximately $18,288,690.00 for Compounded Drugs and other medications prescribed to approximately 171 Postal Service claimants. Of the 171 claimants, 119 were treated by DR. BENDER and also had claims submitted by ACP for Compounded Drugs and other medications. DOL-OWCP paid approximately $15.6 million on these claims. Many of the patients for whom DR. BENDER prescribed Compounded Drugs and other medications through ACP reside in Georgia.

50.     Dr. Mool Nigam ("DR. NIGAM"), according to records of the Texas Medical Board, is a physician licensed in the State of Texas. DR. NIGAM, according to these same records, has a primary specialty in neurology and practices at 6315 Gulfton Street Suite 100 Houston, Texas 77081. DR. NIGAM is enrolled in the DOL-OWCP program.

51.     Between on or about October 1, 2014 to on or about October 30, 2015, billing records of the U.S. Postal Service, indicates that Compound Solutions was reimbursed by DOL-OWCP approximately $2,549,481.00 for Compounded Drugs and other medications prescribed to approximately 33 Postal Service patients whom were also treated by DR. NIGAM.

52.     Between on or about December 20, 2014 to on or about November 20, 2015, DR. NIGAM received from Turnbull Media LLC approximately $50,000.00. Affiant believes based on his investigation that those payments are likely payments for the prescriptions of Compounded Drugs and other medicines that DR. NIGAM sent to Compounding Solutions.

## VII.   Probable Cause to Believe Evidence is Contained in the Subject Account

53.     According to an ACP Employee (ACP EMPLOYEE) from an interview conducted on November 7, 2017, ACP EMPLOYEE was introduced to both CRUISE and JOHNSON as owners at ACP. ACP EMPLOYEE stated JOHNSON would contact ACP on a routine basis to determine the amount of Compounded Drug prescriptions being filled.

54.     Pursuant to search warrants executed as part of this investigation, investigators collected emails from ACP EMPLOYEE which were sent to the SUBJECT ACCOUNT. A search revealed emails sent to and by the SUBJECT ACCOUNT and other accounts that included information about JOHNSON and others with ties to the relevant business entities and the conduct underlying the Subject Offenses.

55.     In or around November 2017, agents served MSN Hotmail with a preservation letter which directed MSN Hotmail to preserve emails sent to and from the SUBJECT ACCOUNT. An extension was requested and granted in February 2018. The preservation request was confirmed on November 28, 2017 under the preservation record number "GCC-919699-G4Y3D4" and on February 21, 2018 under the preservation record number "GCC-919699-G4Y3D4."

56.     Based on my knowledge and experience, generally an email that is sent to an email provider subscriber is stored in the subscriber's "mail box" on the email provider's servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on the email provider's servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the email provider's servers for a certain period of time.

57.     Based on my knowledge and experience, I have learned that Microsoft provides a variety of online services, including electronic mail (email) access, to the public. Microsoft allows subscribers to obtain and retain email accounts at numerous domain names, including

14

@hotmail.com, like the email account listed in Attachment A. Subscribers obtain a @hotmail.com account by registering with MSN.com, which is now owned and maintained by Microsoft. During the registration process, email providers typically ask subscribers to provide basic personal information. Therefore, the computers of Microsoft likely contain stored electronic communications (including retrieved and unretrieved emails for Hotmail.com subscribers) and information concerning subscribers and their use of Hotmail.com's services, such as account access information, email transaction information, and account application information. In my experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

58.     In my knowledge and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (*i.e.*, session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

59.     In some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications,

including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

60.     This Application seeks a warrant to search all responsive records and information under the control of Microsoft, a provider subject to the jurisdiction of this Court, regardless of where Microsoft has chosen to store such information. The government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Microsoft's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

61.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the IP addresses from which users access the email account,

along with the time and date of that access. By determining the physical location associated with

the logged IP addresses, investigators can understand the chronological and geographic context of

the email account access and use relating to the crime under investigation. This geographic and

timeline information may tend to either inculpate or exculpate the account owner. Additionally,

information stored at the user's account may further indicate the geographic location of the account

user at a particular time (*e.g.*, location information integrated into an image or video sent via

email). Last, stored electronic data may provide relevant insight into the email account owner's

state of mind as it relates to the offense under investigation. For example, information in the email

account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications

relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to

conceal them from law enforcement).

62.     For these reasons, I believe that JOHNSON subscribed to or used the SUBJECT

ACCOUNT, and that it contains evidence of the SUBJECT OFFENSES.

### VIII.   Probable Cause of Violations of Federal Law

63.     Affiant believes, and has summarized key facts herein to support this belief, that

probable cause exists that JOHNSON and her associates referenced herein and others have, among

other things, used IFWAA, Compounding Solutions, ACP, Eudora, Top Doctor, and the other

business entities to fraudulently induce FECA and TRICARE to pay claims submitted by

Compounding Solutions and ACP for Compounded Drugs that are not medically necessary,

prescribed through the payment of illegal kickbacks or both. Affiant believes that probable cause

exists that these same individuals have committed the SUBJECT OFFENSES, among others:

conspiracy to commit healthcare fraud under 18 U.S.C. § 1349; healthcare fraud under 18 U.S.C.

§ 1347; conspiracy to pay and receive illegal kickbacks under 18 U.S.C. § 371; and the payment

and receipt of illegal kickbacks under 42 U.S.C. § 1320a-7b(b). Affiant also submits there is probable cause to search the SUBJECT ACCOUNT for the information described in Attachment A for evidence of these offenses as further described in Attachment B.

64.    I submit this Affidavit for the limited purpose of obtaining a search warrant, and, therefore, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of crimes, in violation of the above-referenced federal laws are currently found in the SUBJECT ACCOUNT.

### A.    Probable Cause to Believe JOHNSON used the SUBJECT ACCOUNT to Commit, and In Furtherance of, the SUBJECT OFFENSES

65.    Based on witness interviews, emails obtained from other individuals sent to and from the SUBJECT ACCOUNT, as well as other sources of evidence on which I base the statements in this Affidavit, Affiant believes that probable cause exists to believe JOHNSON and her associates referenced herein and others have, among other things, conspired to defraud DOL-OWCP through fraudulent claims by Compounding Solutions and ACP for Compounded Drugs through the following manner and means, among others: (1) agents of IFWAA, which is operated by JOHNSON and CRUISE, recruit injured federal employees to sign up with IFWAA for "no-cost" assistance with one or more of the employee's claims for workers' compensation; (2) an agent of IFWAA refers the employee to an IFWAA-affiliated physician, such as DR. NIGAM, DR. BENDER or DR. JACKSON; (3) the IFWAA-affiliated physician then prescribes the federal employee a Compounded Drug that is not medically necessary, induced through a kickback, or both; (4) that same physician sends the prescription for the Compounded Drug to be filled at Compounding Solutions or ACP; (5) Compounding Solutions or ACP bills FECA or TRICARE

for the Compounded Drug and other medications; (6) the claims are approved and deposited in the operating accounts of Compounding Solutions or ACP; (7) the proceeds of those payments are then distributed among the co-conspirators, either directly or through the above-referenced entities.

a. Interview of S.C., a former employee of Top Doctor

66.     On August 1, 2017, agents interviewed S.C., a former employee of Top Doctor. On October 24, 2017, S.C. was interviewed by an agent and counsel for the United States. Between April 2016 and February 2017, S.C. was employed as a medical assistant but also worked as a receptionist, conducted urinalyses, generated referrals, and conducted physical therapy.

67.     S.C. knew that IFWAA was referring patients to Top Doctor because (1) S.C. was interviewed by JOHNSON and CRUISE and (2) S.C.'s partner worked at IFWAA as a marketer when it first opened. S.C. was contacted by marketers for IFWAA to schedule patients to be treated by DR. JACKSON at Top Doctor. IFWAA would send a packet to S.C. for the patient.

68.     During several phone calls that began at the start of S.C.'s employment at Top Doctor, JOHNSON told S.C. that every patient needed to be prescribed Compounded Drugs. JOHNSON would call S.C. to ask why every patient was not receiving prescriptions and Durable Medical Equipment. JOHNSON told S.C. to tell DR. JACKSON that DR. JACKSON had to prescribe Compounded Drugs to all patients receiving FECA benefits because the Compounded Drugs paid well.

69.     S.C. understood that JOHNSON was the owner of Top Doctor and that JOHNSON'S instructions should be followed. OZOUDE told S.C. that JOHNSON owned Top Doctor.

70.     DR. JACKSON told S.C. that not all patients wanted or needed Compounded Drugs but JOHNSON had directed that all patients receive Compounded Drugs.

19

71.     DR. JACKSON told S.C. that he wanted to quit Top Doctor, but he (DR. JACKSON) needed the money. DR. JACKSON also told S.C. that he did not like prescribing Compounded Drugs.

72.     S.C. was instructed by JOHNSON to sign Compounded Drug prescriptions for DR. JACKSON when DR. JACKSON left the office before completing the Compounded Drug prescriptions.

73.     Prescriptions for Compounded Drugs prescribed by Dr. JACKSON were sent to Compounding Solutions. Patients received the same prescription for Compounded Drugs regardless of their injury.

74.     Five patients personally returned Compounded Drugs to Top Doctor and asked S.C. to take them back and to stop the Compounded Drugs from coming. The patients were receiving the Compounded Drugs too often and had too much of them.

b.     Interview of E.N., a former employee of DR. BENDER

75.     On December 1, 2017, agents interviewed E.N., DR. BENDER'S former receptionist and office manager. E.N. knew that IFWAA referred patients to DR. BENDER and paid the rent for DR. BENDER'S clinic.

76.     DR. BENDER, according to E.N., was the only person prescribing Compounding Drugs in the office. E.N. reported that some patients complained to E.N. about the Compounded Drugs they received. The patients told E.N. that they did not know what the Compounded Drugs were for. E.N. told DR. BENDER about the complaints and he replied, "Okay."

77.     Patients would fill prescriptions for non-Compounded Drugs at the pharmacy of their choice, while Compounded Drugs were filled and mailed to patients by a pharmacy in Texas. Affiant believes, based on the course of this investigation, that the referenced pharmacy is ACP.

78.     E.N. observed that the prescriptions for Compounded Drugs were kept on the "G" drive and already had the names and medications filled out. DR. BENDER'S secretary would print the prescriptions and give them to DR. BENDER to sign. At times, DR. BENDER would receive and sign 30 prescriptions at one time. Later, IFWAA mailed prescription pads to DR. BENDER, which DR. BENDER'S medical assistant would fill out.

79.     In mid-2017, E.N. started to receive calls from JOHNSON during which JOHNSON asked why every patient DR. BENDER saw was not receiving a prescription for three Compounded Drugs. When E.N. told JOHNSON that DR. BENDER did not believe that every patient needed to receive the Compounded Drugs, JOHNSON stated that this was unacceptable.

80.     E.N. also stated that D.K., another IFWAA employee, told E.N. that prescriptions for Compounded Drugs was the means through which IFWAA employees were paid. D.K., according to E.N., made this statement to E.N. after E.N. told D.K. that some patients did not need prescriptions for Compounded Drugs. D.K. told E.N. that every IFWAA-referred claimant needed to have a prescription for Compounded Drugs. E.N. stated that E.N. understood that IFWAA's goal was to have every claimant or patient prescribed Compounded Drugs by DR. BENDER.

c.   Interview of D.M., employee of IFWAA

81.     On October 16 and November 30, 2017, agents interviewed D.M. who was paid by IFWAA to work at DR. BENDER'S clinic.

82.     D.M. was told by IFWAA employee D.K. that D.M. should not tell anyone that IFWAA owned DR. BENDER'S clinic. D.K. told D.M. that DR. BENDER would do whatever IFWAA needed him to do because IFWAA pays him.

83.     IFWAA paid DR. BENDER based on the number of patients he was treating. According to records obtained as part of this investigation, it was determined CRUISE paid

DR. BENDER'S rent located at 1800 Peachtree Atlanta, Georgia, as well.

84.     JOHNSON would tell DR. BENDER what to do with his medical practice. JOHNSON emailed DR. BENDER'S clinic prescriptions for Compounded Drugs that were already filled out. The Compounded Drug prescriptions were printed out, and D.M. witnessed DR. BENDER sign eight to ten prescriptions at a time without looking at each closely. Once the prescriptions were signed, they would be emailed back to JOHNSON, and JOHNSON would send them to a pharmacy in Texas to be filled. These prescriptions were separate from those filled out on DR. BENDER'S own prescription pad.

85.     Patients told D.M. that they did not want Compounded Drugs, and some were mad about receiving them. When D.M. received a call from a patient, D.M. would notify JOHNSON who would take care of the issue. D.M. also informed DR. BENDER about these patient complaints on several occasions.

86.     D.K. also told D.M. that IFWAA owned the Compounded Drug pharmacy but that D.K. would deny it if asked.

87.     According to D.M., the cost of the Compounded Drugs could be as high as $10,000 to $20,000 per medication.

d.   Interview of G.J., a DOL-OWCP claimant (DR. JACKSON)

88.     On February 23, 2017, agents interviewed DOL-OWCP claimant G.J., an employee of the U.S. Postal Service. G.J. told agents that G.J. injured G.J.'s rotator cuff in or around 2016.

89.     G.J. explained that a co-worker referred G.J. to Top Doctor at 7007 North Loop Freeway, Houston, Texas. G.J. explained that G.J. met with "Shon Johnson," who Affiant believes to be JOHNSON, at the office of Top Doctor.

90.     G.J. explained that G.J. started seeing DR. JACKSON at Top Doctor's office at

22

7007 North Loop Freeway. DR. JACKSON, according to G.J., prescribed pain creams to G.J. These creams, according to G.J., were mailed to G.J.'s residence roughly every three months from Compounding Solutions. G.J. stated that Compounding Solutions last sent G.J. creams in or around January 2017.

91.     G.J. stated that G.J. does not want the pain creams and medicines G.J. receives from Compounding Solutions. G.J. stated that what G.J. receives from Compounding Solutions does not work for G.J.'s pain.

92.     After the interview with agents, G.J. texted to agents a picture of a prescription box. This box lists the name of Compounding Solutions, its above-referenced address, and also the name of DR. JACKSON. The medicine contained therein purports to be LIDOCAIN 5% ointment, an anesthetic commonly used to relieve pain.

93.     From in or around April 2016 to in or around April 2017, Compounding Solutions billed DOL-OWCP approximately $553,798.08 for Compounded Drugs and other medicines prescribed by DR. JACKSON on behalf of G.J. DOL-OWCP paid Compounding Solutions approximately $220,303.11 on those claims.

e.   Interview of G.M., DOL-OWCP Claimant (DR. NIGAM)

94.     On February 8, 2017, agents interviewed DOL-OWCP claimant G.M., an injured federal employee. G.M. stated that following a work-related injury a union official referred G.M. to Top Doctor.

95.     G.M. stated CRUISE operated Top Doctor and understood that Top Doctor changed names to IFWAA. G.M. recalled meeting with "LaShon," who Affiant believes to be JOHNSON, when G.M. first visited Top Doctor in or around August 2014. G.M. explained that DR. NIGAM is one doctor to whom IFWAA would refer injured employees to depending on where the

employee resides. JOHNSON referred G.M. to DR. NIGAM who began prescribing compound pain creams at G.M.'s initial visit. G.M. stated that DR. NIGAM never told G.M. that he was prescribing the creams and never instructed G.M. on how to use the cream. G.M. said in addition to the creams DR. NIGAM also prescribed G.M. oral medications. G.M. stated G.M. told DR. NIGAM's receptionist G.M. did not want the creams.

96.     From on or about October 16, 2014 to on or about September 17, 2015, Compounding Solutions billed DOL-OWCP approximately $250,740.60 for Compounded Drugs and other medicines prescribed by DR. NIGAM on behalf of G.M. DOL-OWCP paid Compounding Solutions approximately $114,971.07 on those claims.

f.   Emails from OZOUDE account

97.     Pursuant to search warrants executed as part of this investigation, investigators collected emails from OZOUDE directed to SUBJECT ACCOUNT or JOHNSON.

98.     On February 10, 2015, OZOUDE forwarded the SUBJECT ACCOUNT an email from an employee at Compounding Solutions with a list of patients who needed prescriptions. OZOUDE requested that JOHNSON obtain prescriptions for those patients even though, based on my investigation, JOHNSON and OZOUDE have no medical training.

99.     On September 24, 2015, OZOUDE sent the SUBJECT ACCOUNT a blank prescription form with pre-determined formularies for Compounded Drugs. Based on my training and experience this is a red flag indicative of fraud. Compounded Drugs are supposed to be individualized for the particular needs of the patient. This email, however, suggests that the prescriptions were not in fact individualized and instead written for financial gain, rather than medical purpose.

100.     On December 17, 2015, a Eudora employee forwarded SUBJECT ACCOUNT and

OZOUDE an email listing patients who had been prescribed medications but reimbursement for the medications had been denied. The email identified two of the patients had the same prescription filled by another pharmacy. The email also attached a list of Compounded Drug prescriptions signed by DR. BENDER and sent to Compounding Solutions between December 1 and 14, 2015. According to the spreadsheet, the prescriptions resulted in over $1.5 million in profits, and the profit margin for each medication ranged from 125.66 to 3,030.00 percent.

101.    On each of the emails dated December 19, 2014, February 23, 2015, and March 12, 2015, the SUBJECT ACCOUNT emailed OZOUDE copies of a signed prescriptions for Compounded Drugs that were filled out on a pre-printed form. The prescriptions were signed by the same physician and prescribed the same Compounded Drugs for each of the different patients.

102.    On January 26, 2017, JOHNSON emailed OZOUDE, CRUISE, and Compounding Solutions employee A.M. directing them that the "protocol" will be that each prescription for Compounded Drugs will have two refills, which according to JOHNSON is the "acceptable" number. Based on my training and experience, this email is indicative of fraud. Indeed, JOHNSON, an individual with no known medical education, is purporting to decide in advance the numbers of "acceptable" refills for Compounded Drugs for each patient. This fact, based on my training and experience, is further evidence that the prescriptions for Compounded Drugs were prescribed not for a medical purpose but for profit of JOHNSON and her co-conspirators.

g.  Emails from ACP EMPLOYEE

103.    Pursuant to search warrants executed as part of this investigation, investigators collected emails from ACP EMPLOYEE which were sent to the SUBJECT ACCOUNT. The emails contained information about patients receiving prescriptions, billing for prescriptions, and Compounded Drugs returned by patients.

104.    On June 12, 2017, ACP EMPLOYEE sent the SUBJECT ACCOUNT an email stating that a patient had refused a package sent by ACP and that the Compounded Drugs in the package had already been reimbursed by the DOL-OWCP.

105.    On July 17, 2017, ACP EMPLOYEE emailed the SUBJECT ACCOUNT that even though a Compounded Drug had been mailed that day, ACP would wait to seek reimbursement for the Compounded Drug because it was too soon to bill the prescription.

106.    On August 16, 2017, ACP EMPLOYEE sent the SUBJECT ACCOUNT an email informing JOHNSON that a patient returned five months of Compounded Drugs sent by ACP. ACP had previously billed DOL-OWCP for the returned drugs.

107.    On August 16, 2017, ACP EMPLOYEE emailed the SUBJECT ACCOUNT stating that reimbursement for a Compounded Drug was rejected because another pharmacy had filled the same prescription. ACP EMPLOYEE suggested that ACP try to submit the prescription for reimbursement again the next month.

108.    On August 21, 2017, ACP EMPLOYEE emailed the SUBJECT ACCOUNT explaining that ACP tried to bill for a Compounded Drug but another pharmacy had already billed for that Compounded Drug. ACP EMPLOYEE also advised SUBJECT ACCOUNT that due to coding, two patients were unable to receive medications.

109.    On October 13, 2017, ACP EMPLOYEE emailed the SUBJECT ACCOUNT stating that DR. BENDER's office had contacted ACP EMPLOYEE about a patient who had refused packages of Compounded Drugs from ACP. ACP EMPLOYEE reported that because there was no refusal letter on file, ACP EMPLOYEE was directed to continue sending Compounded Drugs despite the fact that the patient did not want the Compounded Drugs.

## IX.    Conclusion

110.    Based upon the above information, probable cause exists to believe there has been a violation of federal laws, including, among other offenses:  conspiracy to commit healthcare fraud under 18 U.S.C. § 1349; healthcare fraud under 18 U.S.C. § 1347; conspiracy to pay and receive illegal kickbacks under 18 U.S.C. § 371; and the payment and receipt of illegal kickbacks under 42 U.S.C. § 1320a-7b(b).

111.    Probable cause further exists to believe that evidence of those violations, among others, exist and are contained in the SUBJECT ACCOUNT.

112.    Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Microsoft, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

### X.    Request For Sealing

113.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is not known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Adam Watson
Special Agent, USPS-OIG


Subscribed and sworn to before me on _____April 10_____, 2018, *and I find probable cause.*

Frances H Stacy
UNITED STATES MAGISTRATE JUDGE

28

## ATTACHMENT A
### Property to Be Searched

This warrant applies to information associated with account LASHONYAJOHNSON@HOTMAIL.COM ("SUBJECT ACCOUNT") owned and maintained by Microsoft Corporation ("Microsoft"), which is stored at premises owned, maintained, controlled, or operated by Microsoft, a company headquartered at 1 Microsoft Way Redmond, WA 98052.

1

**ATTACHMENT B**
**Particular Things to be Seized**

I.     **Information to be disclosed by Microsoft Corporation, 1 Microsoft Way**
       **Redmond, WA 98052**

To the extent that the information described in **Attachment A** is within the possession,

custody, or control of Microsoft Corporation ("Microsoft"), regardless of whether such

information is stored, held, or maintained inside or outside of the United States, and including any

emails, records, files, logs, or information that has been deleted but is still available to the

Providers, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) in

November 2017 and renewed in February 2018, Microsoft is required to disclose the following

information to the United States for each account or identifier listed in **Attachment A**:

a.     The contents of all emails associated with the account, including stored or preserved

copies of emails sent to and from the account, draft emails, the source and destination addresses

associated with each email, the date and time at which each email was sent, and the size and length

of each email;

b.     All records or other information regarding the identification of the account, to

include full name, physical address, telephone numbers and other identifiers, records of session

times and durations, the date on which the account was created, the length of service, the IP address

used to register the account, log-in IP addresses associated with session times and dates, account

status, alternative email addresses provided during registration, methods of connecting, log files,

and means and source of payment (including any credit or bank account number);

c.     The types of service utilized;

1

d. All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

e. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

f. For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored.

The Providers are hereby ordered to disclose the above information to the government within fourteen (14) days of the issuance of this warrant.

II. **Information to be Seized by the United States**

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 2 (Aiding and Abetting), 371 (Conspiracy to Pay and Receive Kickbacks), 1347 (Health Care Fraud), 1349 (Conspiracy to Commit Health Care Fraud); and 42 U.S.C. § 1320a-7b (the Anti-Kickback Statute) (collectively, SUBJECT OFFENSES), involving JOHNSON or her associates, or others known and unknown, and occurring on or after January 1, 2014, including but not limited to, the following matters:

1. Any information relating to:

a. The SUBJECT OFFENSES;

b. JOHNSON, CRUISE, OZOUDE, DR. BENDER, DR. JACKSON, DR. NIGAM, or any of their employees, associates, representatives, or relatives who were involved directly or indirectly in billing or providing, or in attempting to bill or provide, any items or services that were billed to FECA, TRICARE, or any government or private insurance provider;

c. Any of the following business entities: IFWAA, Compounding Solutions, Eudora, ACP, Top Doctor (collectively the "business entities"); or any other pharmacies,

2

healthcare facilities, or businesses—real or fictitious—owned in whole or in part, or controlled by

or affiliated with JOHNSON, CRUISE, OZOUDE, DR. BENDER, DR. JACKSON, DR. NIGAM,

or any of their employees, associates, representatives, or relatives.

      d.     Any medical doctor, doctor of osteopathy, physician assistant, nurse

practitioner, pharmacist, or any interns or students of those professions who worked for or were in

any way affiliated with—including as a prescriber—the business entities; or any other pharmacy,

medical facility, medical practice, or FECA or TRICARE provider.

      e.     Any healthcare facility, pharmacy, medical practice, or business entity

owned in who or in part by, or controlled by or affiliated with JOHNSON or her associates.

      f.     Any FECA or TRICARE beneficiaries or individuals who were insured by

government or private insurance providers.

      g.     Any sales or marketing representative and their employees, associates,

representatives, or relatives; and any business entities owned in whole or in part, or controlled by

or affiliated with any sales or marketing representative or their employees, associates,

representatives, or relatives.

      h.     Any pharmacies, pharmaceutical-related companies, pharmacy benefit

managers (PBMs), and compounded pharmaceutical companies and suppliers.

      i.     Any government-funded healthcare benefit programs, including the FECA

and TRICARE Programs, or any private insurance companies.

      j.     Any documents and records, including provider applications, billing

agreements, electronic funds transfer agreements, and claims submission forms.

      k.     The provision of or billing for pharmaceuticals, including compounded and

non-compounded pharmaceuticals, including any documents or records, including but not limited

to prescriptions, inventories, formularies, or any other documents or records necessary or incidental to the provision or billing of those services.

l.      Any bank or financial records, including any bank or financial records that identify the location or use of any FECA, TRICARE, other government, or private insurance funds that were paid to reimburse an individual or entity for pharmaceutical or other items or services; and,

m.      Any documents or records from or that refer or relate to the business entities or any other business entity owned in whole or in part, or controlled by or affiliated with JOHNSON or her associates, including, but not limited to: plans, business formation records, contracts and agreements, roles, contacts, revenues, expenditures, and organizational information.

2.      Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

3.      Evidence indicating the email account owner's state of mind as it relates to the crimes under investigation;

4.      The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

5.      The identity of the person(s) who communicated with JOHNSON or her associates about matters relating to the SUBJECT OFFENSES, including records that help reveal their email accounts and whereabouts;

6.      Records or files containing information about dates, times, and locations of meetings or planned meetings related to the suspected illegal activities;

7.     The identity(ies), including but not limited to name, identifying numbers, email addresses, and physical addresses, of person(s) in the account holder's contacts, buddy lists, and address books who may have any association with the criminal activity under investigation;

8.     The identity(ies), including but not limited to name, identifying numbers, email addresses, and physical addresses, of the person(s) who sent to and/or received electronic communications from the account, or of person(s), including, but not limited to, pharmacy operators, owners, management, and staff, as well as marketers, physicians, physician assistants, nurse practitioners, pharmacists, and other medical professionals regarding the suspected healthcare fraud, kickbacks, related conspiracies, and pharmaceuticals and pharmacy operations in general, including records that assist in revealing those persons' whereabouts.

## **ADDENDUM TO ATTACHMENT B**

With respect to the search of any information and records received from Microsoft, law enforcement personnel will locate the information to be seized pursuant to Section II of Attachment B according to the following protocol.

The search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items as set forth herein):

    a.   searching for and attempting to recover any hidden or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein;

    b.   surveying various file directories and electronic mail, including attachments thereto to determine whether they include data falling within the list of items to be seized as set forth herein;

    c.   opening or reading portions or electronic mail, and attachments thereto, in order to determine whether their contents fall within the items to be seized as set forth herein; and/or

    d.   performing key-word searches through all electronic mail and attachments thereto, to determine whether occurrences of language contained in such electronic mail, and attachments thereto, exist that are likely to appear in the information to be seized and described in Section II of Attachment B.

With respect to law enforcement's review of the information and records received from Microsoft, law enforcement (*i.e.*, the federal agents and prosecutors working on this investigation),

1

along with other government officials and contractors whom law enforcement deems necessary to assist in the review (collectively, the "Review Team"), may use domain-name keywords to isolate communications involving known attorney or law firm domains and segregate such communications, which may contain information or material subject to a claim of attorney-client privilege or work-product protection (collectively, "Potentially Privileged Materials") from the Review Team. With respect to all remaining information and records not isolated and segregated from the Review Team using the domain-name keyword search, the members of the Review Team are hereby authorized to review, in the first instance, such information and records as set forth in Attachment B.

If law enforcement determines that all, some, or a portion of the remaining information or records contain or may contain Potentially Privileged Materials, the Review Team is hereby ordered to:  (1) immediately cease its review of the specific Potentially Privileged Materials at issue; (2) segregate the specific Potentially Privileged Materials at issue; and (3) take appropriate steps to safeguard the specific Potentially Privileged Materials at issue.

Nothing in this Addendum shall be construed to require law enforcement to cease or to suspend the Review Team's review of the remaining information or records simply because Potentially Privileged Materials (once appropriately isolated, segregated, and safeguarded) were located among the information and records.

Law enforcement personnel are not authorized to conduct additional searches on any information beyond the scope of the items to be seized by this warrant.